**SO ORDERED.**

**SIGNED September 22, 2009.**



_____
ROBERT SUMMERHAYS
UNITED STATES BANKRUPTCY JUDGE
_____

```
            UNITED STATES BANKRUPTCY COURT
             WESTERN DISTRICT OF LOUISIANA


IN RE:

CORROSION CONTROL SYSTEMS, LLC              CASE NO. 07-50116

     Debtor                                 Chapter 7
-----------------------------------------------------------------
CORROSION CONTROL SYSTEMS, LLC

     Plaintiff

VERSUS                                  ADV. PROCEEDING NO. 07-5050

OMEGA NATCHIQ, INC., ET AL

     Defendants

-----------------------------------------------------------------
                     REASONS FOR DECISION
-----------------------------------------------------------------
```

The present matter before the court is a dispute between FCC, LLC, d/b/a FIRST GROWTH CAPITAL ("FCC") and the UNITED STATES on behalf of the Internal Revenue Service (the "United States") over the relative priority of FCC's security interest and the United

States' competing tax lien. The debtor, CORROSION CONTROL SYSTEMS, LLC (the "Debtor") originally commenced this adversary proceeding seeking the recovery of past due accounts receivable from OMEGA NATCHIQ, INC. ("Omega"), and DYNAMIC INDUSTRIES, INC. ("Dynamic"), and a determination of rights of the remaining defendants in the proceeds recovered from Omega and Dynamic. Omega and Dynamic have deposited the funds owed to the Debtor into the registry of the court, and the sole remaining issue is the relative priority of FCC's security interest and the United States' tax lien. The parties submitted this matter for decision on stipulated facts, and the court took the matter under advisement following oral argument. The court has reviewed the record, the arguments of counsel, and the relevant authorities, and is prepared to rule.

## BACKGROUND

In January 2005, FCC and Debtor entered into a purchasing agreement under which FCC would purchase the Debtor's accounts receivable at a discount below face value (the "Purchasing Agreement"). The Purchasing Agreement provided for a reserve account to be applied against any charge-backs or any other obligations of the Debtor, and granted FCC a security interest in, *inter alia*:

> All Accounts, whether now existing or hereafter arising, all chattel papers, documents and instruments, whether now existing or hereafter arising relating to Accounts,

-2-

> all rights now or hereafter existing in and to all
> security agreements, leases, and other contracts securing
> or otherwise relating to Accounts or such chattel papers,
> documents and instruments.

The Purchasing Agreement also provided for payment of (1) "minimum purchasing fees" based on the amount of receivables tendered to FCC for purchase each month, (2) an annual $5,000 facility fee, and (3) certain "reimbursable expenses". In January 2005, FCC filed a UCC Financing Statement in Lafayette Parish describing the collateral subject to the security interest created by the Purchasing Agreement. FCC subsequently advanced funds to the Debtor pursuant to the terms of the Purchasing Agreement. On November 2, 2006, the United States filed notices of federal tax liens in Lafayette Parish for (1) the Debtor's unpaid FICA and withholding tax liability for the third and fourth quarters of 2005 and the first and second quarters of 2006; and (2) the Debtor's unpaid federal unemployment tax liability for 2005. The total unpaid tax liability subject to the United States' tax liens is $418,828.73.

On February 2, 2007, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. Both FCC and the United States timely filed proofs of claim. FCC filed a proof of claim asserting a secured claim for **$41,744.22**. FCC's secured claim consists of the following items:

(1) a **$5,000** annual facility fee for 2007,

(2) **$36,000** in minimum purchasing fees that accrued from February 2007, and

(3) **$744.22** in reimbursable expenses covering UCC filing fees and other expenses allegedly subject to reimbursement under the Purchasing Agreement.

The United States timely filed a proof of claim asserting a secured claim of **$418,828.73**. On November 5, 2007, this case was converted to a case under Chapter 7 of the Bankruptcy Code, and Ted Brunson was duly appointed as the Chapter 7 Trustee (the "Trustee").

The present adversary proceeding was commenced by the Debtor prior to conversion as an interpleader seeking a turnover of amounts past due from Omega and Dynamic, as well as a determination of any competing claims to those funds. These past due accounts arose from work performed by the Debtor from August 8, 2006 through November 16, 2006. The Debtor named as defendants Omega, Dynamic, FCC, the United States, and other subcontractors who might assert an interest in the proceeds of the delinquent accounts. After the case was converted, the Trustee filed an amended complaint. Neither Omega nor Dynamic disputed the amounts owed to the Debtor, and agreed to deposit the $257,254.20 owed to the Debtor into the registry of the court. Omega and Dynamic were subsequently dismissed from the case. The court then entered default judgments against four defendants declaring that those defendants had no interest in the funds deposited in the registry of the court. The

-4-

FCC and the United States are the only remaining defendants who assert an interest in the funds deposited in the registry of the court.

**DISCUSSION**

The United States contends that its federal tax lien outranks FCC's security interest in the proceeds deposited in the registry of the court, and that it is entitled to these funds. The Internal Revenue Code establishes "a lien in favor of the United States upon all property and rights of property, whether real or personal" belonging to a taxpayer who does not pay taxes owed to the United States. 26 U.S.C. § 6321. This federal tax lien arises at the time of the assessment and attaches to all property or property rights the taxpayer holds or subsequently acquires. See Texas Commerce Bank-Fort Worth, N.A. v. United States, 896 F.2d 152, 161 (5th Cir. 1990); 26 U.S.C. § 6322. While state law controls in determining the nature of a security interest, federal law governs the relative priority of federal tax liens. See Feiler v. United States, 62 F.3d 315, 316 (9th Cir. 1995). Federal tax liens do not automatically have priority over all other liens. "Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that 'the first in time is the first in right'." United States v. McDermott, 507 U.S. 447, 449 (1993). Under this default rule, however, future advances made

-5-

under an accounts receivable financing agreement often were not protected from intervening federal tax liens. Courts typically held that future advances did not outrank an intervening tax lien because the lender's interest was "inchoate" – "that is, not certain in amount, identity of collateral or identity of lender." <u>UNI Imports, Inc. v. Aparacor, Inc.</u>, 978 F.2d 984, 987 (7th Cir. 1992).

In 1966, the Internal Revenue Code was amended to include certain protections for "commercial transactions financing agreements." <u>See</u> 26 U.S.C. § 6323(c). Section 6323(c) provides that:

> (1) In general.--To the extent provided in this subsection, even though notice of a lien imposed by <u>section 6321</u> has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which--
>
> (A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting--
>
> (I) **<u>a commercial transactions financing agreement,</u>**
>
> (ii) a real property construction or improvement financing agreement, or
>
> (iii) an obligatory disbursement agreement, and
>
> (B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

(Emphasis added).

The Internal Revenue Code defines "commercial transactions financing agreement" as follows:

> (A) Definition.--The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)--
>
> (I) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or
>
> (ii) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;
>
> **but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing**.

16 U.S.C. §6323(c)(2)(A) (emphasis added). The term "qualified property" as used in section 6323(c) includes "only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing." These provisions create a 45-day "safe harbor" after the filing of a federal tax lien during which advances or purchases still have priority over the government's lien if the lender does not otherwise have actual notice of the lien. The Internal Revenue Code defines "commercial financing security" to include accounts receivable. See 26 U.S.C. § 6323(c)(2)(C).

-7-

The parties do not dispute that the Purchasing Agreement is a "commercial transactions financing agreement" subject to section 6323(c). Based on the undisputed facts, the receivables at issue are "qualified property" because they are (1) "commercial financing security" within the meaning of section 6323(c)(2)(C), and (2) the receivables were acquired by the Debtor before the 46th day after the date of the filing of the United States' tax lien. Accordingly, under section 6323(c)(2), any advances or purchases made by FCC prior to the filing of the tax lien or before the 46th day after the date of the filing of the tax lien will have priority over the United States' tax lien.

FCC's claim, however, is not based on advances or purchases made before the 46th day after the filing of the United States' tax lien. Rather, FCC's claim is based on fees, charges, and reimbursable expenses incurred outside of this 45-day safe harbor. FCC contends that these items nevertheless have priority over the United States' tax lien because they are "carrying charges" entitled to protection under section 6323(e). Section 6323(e) provides:

> (e) Priority of interest and expenses.--If the lien imposed by section 6321 is not valid as against a lien or security interest, the priority of such lien or security interest shall extend to--

(1) **any interest or carrying charges upon the obligation secured**,

(2) the reasonable charges and expenses of an indenture trustee or agent holding the security interest for the benefit of the holder of the security interest,

(3) the reasonable expenses, including reasonable compensation for attorneys, actually incurred in collecting or enforcing the obligation secured,

(4) the reasonable costs of insuring, preserving, or repairing the property to which the lien or security interest relates,

(5) the reasonable costs of insuring payment of the obligation secured, and

(6) amounts paid to satisfy any lien on the property to which the lien or security interest relates, but only if the lien so satisfied is entitled to priority over the lien imposed by section 6321,

to the extent that, under local law, any such item has the same priority as the lien or security interest to which it relates.

(Emphasis added). The Internal Revenue Code does not define "carrying charges." However, the context in which this term is used in section 6323(e)(1) indicates that the types of "carrying charges" protected under section 6323(e) are limited to interest and costs ancillary to advances or purchases that otherwise outrank a competing federal tax lien under section 6323. Section 6323(e) does not refer to carrying charges in general, but refers specifically to carrying charges "**upon the obligation secured**."

-9-

Accordingly, in order to qualify as a "carrying charge" there must be a connection between a charge and the economic cost of carrying funds that were advanced by the lender to the borrower prior to the filing of the tax lien or within the 45-day safe harbor of section 6323(c). This reading of "carrying charges" is consistent with the history of section 6323(e) as well as the cases construing that provision.

Prior to the enactment of section 6323(e), courts generally held that interest, fees, and other charges ancillary to the principal obligation were "inchoate" and subordinate to an intervening tax lien even though the principal obligation outranked the tax lien. See, e.g., United States v. Equitable Life Assurance Society, 384 U.S. 323 (1966). Section 6323(e) was enacted to protect interest and charges ancillary to a secured obligation that otherwise outranks an intervening tax lien. In Municipal Trust & Savings Bank v. Clark, 374 F.Supp. 2nd 647, 648 (N.D. Ill. 2005), the court addressed whether late fees on a mortgage were carrying charges within the meaning of section 6323(e). The court reasoned that the carrying charges protected by section 6323(e) were costs that bore a direct financial relationship to the cost of "carrying" the funds previously advanced by the mortgage holder. Applying this definition of carrying charges, the court concluded that late charges do not constitute carrying charges because they do not

-10-

reflect the cost of carrying a debt incurred prior the filing of the tax lien, but are designed "simply to induce timely payment of the mortgage installments." Id.

In the present case, FCC's claim consists of three items: (1) $36,000 in minimum purchasing fees, (2) $5,000 annual facility renewal fee, and (3) $744.22 in reimbursable costs. With respect to the minimum purchasing fees, the Purchasing Agreement provides for a monthly minimum purchase requirement of $500,000. If the amount of accounts receivable available for purchase for a given month falls below $500,000, FCC is entitled to 0.9% of the difference as a minimum purchasing fee. Purchasing Agreement at ¶ 3.6 (as amended by agreement on August 23, 2005). The $36,000 in minimum purchasing fees included in FCC's claim reflects the fees that have accrued monthly from the commencement of the bankruptcy case in February 2007. FCC contends that these minimum purchasing fees are "carrying charges" protected under section 6323(e) because the Debtor was obligated to pay these fees once the Purchasing Agreement was executed in January 2005. The court disagrees. Like the late charges addressed in Clark, these minimum purchasing fees do not reflect the economic cost of carrying a secured obligation incurred prior to (or within the 45-day safe harbor) the filing of the United States' tax lien. Instead, these fees are determined at the end of each month based on the amount of receivables tendered

-11-

to FCC for purchase. Accordingly, the United States' tax lien outranks any security interest held by FCC with respect to the minimum purchasing fees. The $5,000.00 annual facility fee for 2007 similarly does not qualify as a "carrying charge" under section 6323(e). Like the minimum purchasing fees, the annual facility fee bears no relationship to the economic cost of carrying any secured obligations incurred prior to the filing of the tax lien or within the 45-day safe harbor.

Finally, unlike the minimum purchasing fees and the annual facility fee, the $744.22 of reimbursable costs claimed by FCC arguably may fall within section 6323(e)(1), (3), or (5). According to FCC's proof of claim, these reimbursable expenses included "specified costs, including bank fees, UCC search fees, etc." However, neither FCC's proof of claim nor the record provide any additional information on the nature of these costs so that the court can make a determination as to whether these expenses fall within any of the categories of section 6323(e). As a party challenging the priority of a federal tax lien, FCC had the burden of establishing the basis for its claim that its security interest outranks the United States' tax lien. Based on the current record, FCC has not met its burden with respect to the reimbursable fees.

## CONCLUSION

For the foregoing reasons, the United States' tax lien outranks FCC's security interest in the **$257,254.20** of proceeds from the accounts owed by Omega and Dynamic. The United States shall submit a judgment consistent with the court's ruling herein within 30 days of the entry of these Reasons for Decision.

###